Caldwell, J.
The complainant is a branch of the State Bank of Ohio, organized under the act of February 24th, 1845 , to incor porate the State Bank of Ohio and other banking companies.
The bank has filed this bill against the treasurer of Hamilton *509 county, to enjoin the collection of a tax, under the statute of 1851, taxing banks and bank stock as other property. The bill alleges that this statute is inconsistent with the 60th section of the bank law of 1845, and is therefore void, as being in violation of the charter of the bank. It further alleges that the defendant, as treasurer of the county, is about to proceed to collect said tax by distress, by seizing the personal property and money of the bank, and prays that he may be enjoined, etc.
The first question arising is, whether the case presented is one which warrants the interference of a court of chancery.
The claim set up by the complainants is, that, the law under which the treasurer is proceeding to act is unconstitutional and void.
The treasurer, therefore, if he proceeded to act, would be a mere trespasser, and liable personally for the full amount of damage re. suiting from such action.
Now it is a well settled principle, that a court of chancery will not interfere to prevent a mere trespass, where a complete and adequate remedy can be had by the party injured by an action at law; it is only in cases where, from some peculiar circumstance-connected with the parties or with the transaction, that complete redress can not be had at law; that a court of chancery is warranted in assuming jurisdiction.
The rule is laid down in Story’s Equity Jurisprudence. The-author says: “ Courts of equity interfere in cases of trespass; that is to say to prevent ii'reparable mischiefs, or to suppress multiplicity of suits and oppressive litigation. “ For, *if the trespass be fugitive and temporary, and adequate compensation can be had in an action at law, there is no ground to justify the interposition of courts of equity.” 2 Story’s Eq. Jur. sec. 928. Now, in this case, we do not see that any of the circumstances exist which would authorize the action of a court in chancery. It • is true it is-alleged in the bill that the treasurer is in embarrassed circumstances, and that he would not be able, probably, to respond in damages. This, however, is explicitly denied in the answer, and there-is no proof of the allegations of the bill. The property in which the trespass is apprehended is personalty, without any showing of any difficulty in proving its value, having no peculiar value that could not be arrived at. The mischief, therefore, in legal contemplation, is not extraordinary or irreparable. It is not a case in *510 which it is necessary that the court should interfere to prevent a multiplicity of suits. The claim is a single and isolated one, made by a corporation for a specific and definite sum, not dependent on or analagous to any other claim presented by any other individual, and involving no oppressive litigation in seeking redress. The court, in the case of McCoy v. The Corporation of Chillicothe, 3 Ohio, 370, say: “The separate repetition of trespasses, laying a ground for separate suits between the same parties, is not that description of multiplicity of suits which induces equity to interfere. Where many parties and different rights are involved in the same transaction, all of which can not be legally adjusted without several suits, this ■state of things is sometimes held a sufficient ground for chancery interference.” Indeed, we think the case of McCoy v. Chillicothe is directly in point, covering the whole of this case. In that instance, as in this, the party against whom the tax was assessed sought the aid of a court of chancery, on the ground that the law in pursuance of which the tax was levied was unconstitutional and void; the court held that the case did not come within the jurisdiction of chancery, the complainant having an adequate remedy ,at law. There is but one difference, in fact, between that case and this : that was the *case of an individual seeking redress; in this instance it is a corporation. This, we suppose, makes no difference in principle; where the injury sought to be relieved against is the same, it matters not whether the aid of the courtis invoked by .an individual or by a corporation. It is said, however, that a court of chancery will lend its aid where a statutory or corporate right is about to bo invaded; and it appears to be thought, that in favor of such rights an exception to the general rule has been made that will apply to this case.
Now, if the collection of this tax is unlawful and would amount to a trespass, it would be a violation of the rights of the corporation, as every trespass is a violation of right, whether attempted under color of law or not: it would, however, be merely an attack ■on its property without attempting to destroy or meddle with the exercise of the franchise of the bank, so far as the exercise of its powers is concerned. It is not an attempt to prevent the bank from doing business according to the provisions of its charter, and receiving the emoluments arising from such business.
We have been referred to the case of Osborn v. The Bank of the United States, 9 Wheat. 738, by counsel for complainant, as in *511 point in this case. In that case the supreme court of the United States sustained the chancery jurisdiction, on the ground that the act sought to be enjoined, if performed, would effect a total destruction of the franchise of the bank, so far as Ohio was concerned.
The court say: “The legislature had passed a law for the avowed purpose of expelling the bank from the state, and had made it the duty of the auditor to execute it as a ministerial officer. He had declared that he would perform this duty. The law, if executed, would unquestionably effect its object, and would deprive the bank of its chartered privileges, so far as they were to be exercised in that state. It must expel the bank from the state;1 and this, we think, a conclusion which the court might rightfully draw from the law itself.” The court further say: “ The application to the court was to interpose its writ of injunction to protectthe bank, not *from the casual trespass of an individual who might not perform the act he threatened, but from the total destruction of its franchise, of its chartered privileges so far as respected Ohio.”
And on this finding that the act about to perpetrated would detroy the franchise of the bank, the court based its decision. The amount of the tax was $100,000, which they find was intended to drive the bank out of the state, and must, if not prevented from being carried into effect, produce that result. It can not be contended that any such state of fact exists in this instance. The law under which the tax is levied requires that the property of the bank should be taxed, as the property of individuals is taxed—nothing destructive or oppressive in its character.
The cases to which we have been referred by the counsel in argument to sustain the chancery jurisdiction, all, as we think, differ materially in principle from the present. One of these cases, that of the Croton Turnpike Company v. Ryder et al., 1 Johns. 610, will illustrate the distinction. In that instance the defendants had erected a shunpike, by which the travel was enabled to pass around the toll gate of the corporation, thus depriving it of its business, and this was the whole ground of complaint. There was no forcible injury to the property of the company apprehended; no money or other property to which it could lay claim was to be taken possession of or appropriated; the injury, from its very nature, was impossible of computation, and, without the aid of a court of chancery, redress could only be sought by vexatious litigation—there was no adequate remedy at law. The court, in laying down the *512 principle, say: “ The equity jurisdiction in such a case is extremely benign and salutary. Without it, the party would be exposed to constant and ruinous litigation, as well as to have his rights excessively impaired by frauds and evasion.”
The case of Livingston & Fulton v. Vaningen et al., 9 Johns. 507, on the authority of which The Croton Turnpike Company u. Ryder was decided, was one in all respects ^similar. The complainants had a monopoly in the steam navigation of the Hudson river, the defendants had put steamboats on the river, that were depriving them of the business and emoluments intended to be secured by the statutory privilege, rendering it of no effect; and the injury, as in the other instance, would have been impossible of definite calculation.
We think no distinction exists in reason between an injury done to property in the hands of a natural person, and the same or a similar injury done to property belonging to an artificial person. It is only on the ground that an adequate and complete remedy can not be had at law, that a court of chancery is warranted in interfering in either case. If a statutory right is invaded, so that a body corporate is likely to lose such right, or be prevented from the exercise of it, chancery will interfere. If irreparable mischief is about to be done to the rights of an individual, it will also interfere; but where it is a simple trespass to personal property, as in the present instance, it is not warranted in interfering, let the property belong to whom it may. Even for infringements of patents for invention and copyrights chancery only claims jurisdiction on the ground that, in such cases, it is necessary to prevent multiplicity of suits and vexatious litigation.
It has been contended, however, in argument, that if the bank is required to pay this tax, it will diminish its capacity to do business, and, in that way, deprive it to that extent of the benefit of its franchise. This consequence we think too remote to call forth the exercise of the extraordinary powers of a court of chancery. It no more diminishes the capacity of the bank to do business, than it would the capacity of a natural person to carry on and enjoy his business; and when the law has afforded its redress, by an action of trespass, in legal contemplation, the capacity of the bank is restored. ,
Believing that there is no state of fact presented which authorizes the action of a court of chancery, the bill must be dismissed.
*513 *This disposes of the case; but there were some questions raised in argument which were supposed to be involved in the controversy, that I can not leave without a few remarks. It is contended that this bank, under the 60th section of the law of 1845, under which it claims to exist, is exempted from taxation, except as therein provided. That section reads thus:
“ Each company organized under this act, or accepting thereof and complying with its provisions, shall, semi-annually, on the days-designated in the fifty-ninth section for declaring dividends, set off to the state six per centum on the profits, deducting therefrom the-expenses and ascertained losses of the company for the six months-next preceding ; which sum or amount so set off shall be in lieu of all taxes to which such company or the stockholders thereof, on account of stock owned therein, would otherwise be liable.”
Now, it is said that this provision, being contained in a charter, amounts to a contract on the part of the legislature, that no greater-tax than therein enumerated should over be levied on the bank, and that the attempt of the legislature to pass a law to tax the property of the bank as the other property of the state is taxed, comes within the prohibition of the 10th section of the 1st article of the Constitution of the United States, preventing the states-from passing any law impairing the obligation of contracts. Is-this charter, then, a contract on the part of the legislature, or is it a law? The legislative power of the state is vested in the general assembly. This body is elected by the people, whose representatives they are ; their business is to pass laws, prescribe rules of action ; their powers are limited to the passage of laws, and to the-fixing of rules necessary for their government in the performance of their legislative duties, except in those cases where, by express provision, duties other than legislative are conferred. The general assembly have not general powers over the interests of community, either individually or collectively,- except in the exercise of legislative powers. They have no right to create institutions and fix rules for their government, except as legislators. They are clothed for the time being with the sovereignty of the state, to be exercised by them without any power to barter or sell it.’ They can not abridge the legislative power of the state so that their successors will not possess the same powers that they possessed. The legislative power to repeal a law is co-extensive with the power to enact it. If the legislature were to attempt to abridge the rights *514 ■of a future legislature to repeal or modify their acts, such attempted restriction would be void.
If they attempted to restrict future legislation under the name of ■contract it would be equally void; it would be a bartering away the sovereignty of the state. But no legislature has ever attempted to contra-distinguish their proceedings in the passage of acts of Incorporation from the passage of other laws. They all commence in the form of a law—“ Be it enacted, etc.”—all the forms of legislation are observed in their passage through the two houses; they are all evidenced as laws—called laws—published in the code of laws without any distinction from other laws. In short, treated by all parties, interested and disinterested, as laws. If laws, then they must be subject to repeal or alteration, else the legislative sovereignty could be exhausted, destroyed by the legislature; the peojde could still elect their representatives, but their powers of legislation would depend on what their predecessors had done.
Does a charter contain the requisites of a valid contract? One requisite is that mutuality must exist; both parties must be bound to performance, or neither is bound. Are the corporators bound in an ordinary charter to do anything ? They are not bound to do anything. They need not commence acting at all; and, having ■commenced, they may at any time cease to act. It is true that, whilst acting, they are bound to act in accordance with the terms of the law creating the corporation, just as all other parties are bound to an observance of the laws in their actions in whatever capacity; but they are at no time bound to continue to *do any thing. What recovery could be had by the other party (the ■state) for their failure to continue the business provided for in the ■charter ? What would be the form of the action ? What would be the measure of damages ? And how should they be assessed ? In •order to make a binding contract, there must be a good or a valuable consideration. According to our law, all contracts can be avoided in whatever form they may exist for the want of this requisite. Yet whoever thought of avoiding a charter on the ground that the contract under which it existed was void for want of consideration ? Although in many instances it would be the easiest possible thing to prove that no consideration either good or valuable existed ■on the part of the corporation. Whoever thought of impeaching a ■charter on the ground of misrepresentation on the part of the corporators in obtaining it, although such state of fact has frequently *515 been said to exist ? Who, of the thousands of persons that have approached the legislature of the state for the purpose of obtaining charters, has thought or felt that he was striking a bargain with the legislature, by which the legislature was to agree that the sovereignty of government over a subject, by both parties adrnitted to be within its control, should be suspended ? What citizen ever had “the boldness to express himself so corruptly, so treasonably, in a manner so degrading to the dignity of his state? Yet this would be only proper language for him to use, if the doctrine that a charter is a contract over which the legislature ceased to have control was true. What general assembly or what compiler ever thought of dividing the published legislative proceedings, so as to discriminate between the bargains or contracts, and the ordinary laws ? Yet, if that distinction exists, there would be great value and propriety in making the discrimination. Although the doctrine has been some time in Vogue, and has been pressed with all the perseverance that selfishness and .avarice could dictate; yet we think that a large part of the published proceedings of a legislative body, headed bargains or contracts, would strike the mind of the true man as startling. *And although it has been so declared by high authority, neither the natural or legal mind has ever been able to realize the idea that a charter is a contract.
It is a law of the legislature, and nothing else. But supposing that the legislature considered it as a contract, and that it was so regarded by the corporators, and that the legislature did agree that the charter created should not be under the future control of the legislature. The contract, so far as it restricted future legislative control, must be void for the reason above stated. The legislature can not dispose by contract of any part of the sovereignty of the state; they can not contract away any branch or subject of legislation. If the legislature make a contract, it is not in their own right, it is as the agents or representatives of the people. If an agent transcends the power conferred on him, any contract which he may make will not be binding on his principal, so far as it is made without authority. Take the charter under consideration as an illustration of the effect of one legislature attempting to control the action of a subsequent one by bartering away some subject of legislation. Now it is said that the general power of taxation over the property of this bank is gone, that a law taxing the property of this bank as the property of other persons is void, because *516 it is said that a previous legislature has contracted that the bank should not be taxed in this way, but should only be taxed by a per centum on its profits. The power of taxation is one of the sovereign powers of the state, it can only be exercised through the-legislature, it is a power that has constantly to be resorted to, can never be dispensed with, it is inseparable from government, without which, government must cease to exist. It must be proportioned to the wants of the state, and must be made commensurate with those wants. From its very nature it must be constantly varying in its objects and in its amounts. Now no person will doubt but that the legislature originally had the power to tax all the property of citizens within the state, and to make that tax equal on all without respect to persons; they had also the same power *over the property of colorations within the state, all the property owned in the state, no matter by whom, being subject to this power. By the law of 1851, the state has attempted to exercise this original power by taxing the property of this bank as other property is taxed, and this is considered a grievance, because it is said that, the legislature of 1845 had contracted that the property of the bank should not be thus taxed. If this be true, then the legislature of 1845 have bargained away a portion of the sovereignty of the-state, have sold out a part of the taxing power. The legislature of the state has no longer the capacity of doing right, doing equal justice, requiring the taxes to be equal; one very important prerogative of legislation is gone. Had the legislature of 1845 any right, to make such a bargain ? If they had attempted it, would it not have been treason ? treason of the blackest kind ? Could any citizen of this country, who has the heart or spirit of a freeman, contemplate such an idea without a shudder ? Because if the legislature can bargain away the taxing power of the state in one instance they can in another; if they can bargain it away to companies they can to individuals; if they can sell out the sovereignty of the state, in part they can in whole, and thus bring the government to an end.
In 1851 the people of this state formed a new constitution; one-of its provisions requires that the property of the state shall be equally taxed, as well that which belongs to corporations, such as. this, as the property of individuals. That the people of this state once could have formed such a constitution and carried it into effect, no one will doubt. But if the doctrine here contended for be true, the people of this state can not carry their constitution. *517 into effect; the sovereignty of the state has been in fact disposed of, .sold out.
It is said, however, that the authority of the legislature over the taxing power may be disposed of for' a limited time. It can no more be disposed of for a limited time than it can be parted with forever; being one of the inherent sovereign powers of the state, it is in noway the subject of barter or *sale. Nor would it matter what bonus m-ight be paid by a party obtaining such a contract; the sovereignty of the state can.not be computed in dollars .and cents; it is above price. The sovereignty of government is an object held dear by all people; it should be especially so by a free people in whom it is vested. In the history of the world we have many instances of humanity exhibiting itself in a truly sublime attitude in defense of its sovereignty; few nations have been so degraded that they would give up this inestimable boon without a struggle; very few have been willing to bargain it away; and it is truly humiliating that any portion of the people of this country .should feel that the sovereignty of a state was the proper subject of barter and sale.
Could the framers of the constitution of the United States have ever meant to include under the term contracts, these legislative enactments ? By the term contract we suppose they meant what at that time the term was understood to express. It was long after the formation of that instrument before such enactments were supposed to be contracts. No legal writer had treated of them as contracts, nor had they in any way been spoken of as such; the decisions, which first declared so, gave to the world a new term, as well as a new idea, for the thing. No extraordinary latitude should be given to the use of this provision in the constitution of the United States; no general power is given to the general govern- ■ ment over the affairs of the states; the general' government was not made the supervisor of the state governments to determine when they were acting in good faith within the sphere of state sovereignty ; the determination of this question was thought to be better left with the states themselves, and was so left. It is sometimes urged that it would be a very dangerous power for the legislature to exercise, in any way to assume control over chartered institutions. This idea appears to me to be entirely visionary. Government by virtue of its sovereignty claims the right to take any citizen’s property from him when it is needed for public uses; although *518 he may have paid his money to the government ^itself and! received a deed guarantying it to him and his heirs forever, by a contract of the most solemn kind, yet such contract is made subservient to the sovereignty of government; and why a person who-receives a charter conferring on him some right, which he was not entitled to as a citizen—a privilege not enjoyed by his fellow-citizens generally—should hold it beyond the control of government, or why government should regard it as more sacred than the natural and common rights of the citizen, I can not see.
Believing, as I do, this doctrine—that a charter is a contract-within the meaning of the constitution of the United States, that therefore the legislature ceases to have control over it, and that in this way the taxing powers and other powers of legislation may be surrendered for the benefit of corporations—to be subversive of the rights of the people, at war with the principles of our government, and fraught with mischief incalculable, I feel impelled, as a lover' of the free institutions of my country, and its principles of equality, on all proper occasions, to enter my protest against it. The-bill will be dismissed.

Bill dismissed.

Thurman, J., did not sit in this case.